IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JUDI E. MCCLAIN, as personal Representative of the Estate of Keith Everett Puckett, <br><br> Plaintiff, <br><br> v. <br><br> SHERIFF OF MAYES COUNTY, in his official capacity; and MAYES COUNTY OKLAHOMA, <br><br> Defendants. | Case No. 11-CV-0692-JHP-TLW |

## OPINION AND ORDER

Before the Court are Defendant Sheriff of Mayes County's (the "Sheriff") Motion for Summary Judgment [Doc. No. 49] and Defendant Mayes County Oklahoma's (the "Board") Motion for Summary Judgment [Doc. No. 50]. After review of the briefs, and for the reasons stated below, the Sheriff's Motion for Summary Judgment and the Boards Motion for Summary Judgment are **GRANTED.**

## BACKGROUND

### A. Procedural History

On November 3, 2011, Plaintiff commenced this action by filing a Complaint in this Court, asserting claims stemming from events occurring on February 15, 2010. [Doc. No. 2]. In her Complaint, Plaintiff asserted the following claims: (1) 42 U.S.C. § 1983 claim against Sheriff Cantey in his official capacity; (2) supplemental state law claims against Mayes County for the negligence of its employees under Okla. Stat. tit. 51, § 151; and (3) supplemental state law claims against Mayes County for its negligence under Okla. Stat. tit. 51, § 151. [*Id.*] On

1

February 6, 2013, the Court granted Defendant Frank Cantey's Motion for Substitution of Parties [Doc. No. 18] pursuant to Fed.R.Civ.P. 25(d), substituting "The Sheriff of Mayes County in his Official Capacity" for "Frank Cantey, Sheriff of Mayes County, in his official capacity." [Doc. No. 25]. On April 22, 2013, the Defendants simultaneously filed the motions for summary judgment now before the Court. [Doc. Nos. 49, 50].

**C. Factual Background**

The Mayes County Jail and Mayes County Sheriff's Office began moving to a new facility at some point in 2005 ("new jail"). The old facility was used, in part, as storage space at all times relevant to this action.[1] In late 2005, as the move was taking place, Sheriff Cantey placed Doug Parent ("Parent") in charge of evidence, including moving evidence from the evidence room in the old jail to the new evidence vault located in the new jail. When Parent took over evidence responsibilities, he made a spreadsheet listing all evidence, the type of evidence, the case number, and other relevant details. Parent did not believe, however, that all of the materials in the old evidence room was "evidence." Specifically, Parent erroneously believed that numerous five gallon plastic buckets located in the old evidence room were trash buckets containing non-hazardous destroyed drugs sent back from the lab, and did not unseal the buckets to investigate their contents. In reality, at least some of the materials contained in the white plastic buckets were drugs. At some point prior to 2007, Parent advised Sheriff Cantey that the old evidence room was basically empty, that only a few "things" were left in the old evidence room, and that everything Parent believed to be of evidentiary value from current cases had been moved over to the new evidence room. At that time, Parent made no mention to Sheriff Cantey of leaving drugs in the old evidence room.

---

[1] For purposes of clarity, the old facility, including the old Sheriff's Office and the old Mayes County Jail, will be referred to as the "old jail."

Trustees were given some level of access to the old jail. In order to get into the old jail, a trustee would first have to gain access through two steel doors to proceed from the new jail into the old jail. After entering the old jail, a trustee would then have to proceed through a steel mesh door secured with a tumbler lock at all times. The old evidence room, was protected by a heavy steel door, which was secured by a key-operated padlock. When trustees were working in the old jail, there were cameras mounted over the hallways of the old jail monitoring the trustees' activities.

At all times relevant to this action, the following official policies were in place at the Mayes County Jail:

> 1. Trustees were not allowed to go into the old Sheriff's Office or old jail unless supervised by a jailer.
>
> 2. Upon discovering an inmate in medical distress, jailers on scene were to insure prompt medical attention in all emergencies, contact an ambulance, provide first aid, and take all actions necessary to provide medical assistance to inmates.
>
> 3. An inmate under the influence of alcohol or drugs was to be placed in a holding cell and closely observed for four to six hours or until sober, and should be transported to a hospital via ambulance in the event of an emergency resulting.
>
> 4. All jailers must be constantly alert to the need for safety, and shall conduct searches whenever there is reason to believe contraband was introduced into the facility.
>
> 5. The introduction of contraband into the jail or possession of contraband is a threat to the security of the facility and the safety of its staff, inmates and visitors, and the jail facility staff must take reasonable precautions to prevent the introduction of contraband and must in no way hinder the discipline or prosecution of persons possessing contraband. Under no circumstances may a jailer keep contraband.
>
> 6. The control and accounting of keys is crucial to the maintenance of the security, and at no time shall any inmate be allowed to possess any key.

A factual dispute exists as to whether these policies and procedures were enforced. Specifically, there is some evidence in the record that inmates were routinely allowed to possess the keys to

3

the old jail; inmates were not supervised while in the old jail; and that inmates were allowed to work at the local golf course, even after it was discovered that trustees were bringing drugs obtained at the golf course back into the jail.

Charles Smallwood ("Investigator Smallwood"), a narcotics investigator, testified that he informed Sheriff Cantey at some point prior to October 17, 2009, that drugs were present in the old evidence room. In addition, Investigator Smallwood testified that he specifically relayed concerns about the presence of drugs in the old jail, particularly in light of the number of inmates, visitors, and tenants having access to the old jail, to Sheriff Cantey.

On October 17, 2009, Keith Puckett was arrested by an Officer of the Choteau Police Department for driving under the influence, among other crimes, and was booked into the Mayes County Jail. In January 2010, Puckett and fellow inmate Kevin Newman ("Newman") gained access to the evidence room in the old jail, and found a large quantity of drugs, including cocaine and marijuana. Thereafter, unbeknownst to jail employees, Puckett and numerous other trustees housed in the A Pod of the new jail began to get high on cocaine on a regular basis. On February 5, 2010, jailor Donald Smith informed fellow jailer Cevin Smallwood ("Smallwood") that Puckett was "swinging a broom handle around like it was a sword." Puckett was immediately placed in a "drunk tank." Ten to fifteen minutes later, Smallwood investigated the issue, and determined that Puckett was under the influence of drugs, to which Puckett later admitted. Smallwood immediately caused Puckett's six-person cell searched, and jailer Todd David, who was searching Puckett's cell at Smallwood's direction, discovered a syringe in the shower drain of the cell. Smallwood then conducted a strip-search of Puckett's cellmates and placed them in another "drunk tank." Smallwood then searched the six-person cell himself, and found a white

4

powdery substance in the mattress assigned to Puckett. Smallwood then interviewed Puckett, who stated that people were bringing "stuff," presumably referring to drugs, into the jail.

Smallwood informed Jail Administrator Don Chambers ("Chambers") of the situation and Puckett was charged with possession of a controlled substance. Chambers interviewed other trustees, including Newman, to determine from where the drugs had originated, and caused several trustees to be drug tested. Sometime thereafter, Newman and Puckett were placed in the same isolation cell, where Puckett remained for the next ten days.

On February 5, 2010, Keith Meeks ("Meeks") was made a trustee, and placed into A Pod. Not long after being made a trustee, Meeks obtained cocaine from inmate Robbie Harvey ("Harvey"), and subsequently "drank it in Kool-Aid." Harvey informed Meeks that there was more cocaine somewhere in the old jail. On approximately February 10, 2010, Chambers had Meeks tested for drugs. When Meeks failed the drug test, Chambers demanded that Meeks reveal the source of the drugs. Meeks presumably informed Chambers that the drugs came from the old jail. Meeks testified that he and other trustees were brought in to search the old jail for contraband on at least three occasions. While a small amount of marijuana and a syringe was found, Meeks testified that he never found any cocaine or any large amount of drugs. Meeks testified that he informed Chambers of the drugs that were discovered during these searches.

Jailers also conducted several other searches in the days after Puckett confessed to being under the influence of drugs. Jailer Jeff Bartlett and other jailers on his shift performed several searches of the old jail. During these searches, they discovered a smokeless tobacco can with a small amount of white powdery substance on it and a small bindle of cocaine in the women's bathroom of the old Sheriff's Office. Believing they had located the source of the drugs, Jail employees subsequently concluded their investigation into the source of the drugs.

On February 14, 2010, at 7:00 p.m., Jailer William "Shane" Thompson ("Thompson") reported to work. Upon his return, Thompson was aware that Puckett was in lockdown in B Pod because he had been caught with drugs. During the 7:00 p.m. headcount on February 14, 2010, Thompson and Meeks had an encounter in which they spoke to each other, and agreed to have another discussion later that evening. Further, while Thompson was doing the headcount, Newman asked Thompson whether he had spoken with Meeks, and Thompson responded that he had not. At that time, Puckett, Newman, and another inmate, Kyle Smith ("Smith"), were in a cell together. While Thompson was dispensing medication in Newman, Puckett, and Smith's isolation cell around 9:00 p.m., Meeks approached the cell, and there was a conversation between Meeks and the others. Thompson testified that Newman whispered something to Meeks; however, Thompson didn't hear what was said. Meeks testified that both he and Thompson learned from Newman at this point that the drugs were hidden in toilet paper boxes in the drunk tank of the old jail.

After Thompson completed the 9:00 p.m. medication round, Thompson and Meeks had another conversation in the rotunda regarding items in the old jail. The commissary supervisor, Dennis Sweet ("Sweet"), then came to booking, and told Thompson to have Meeks take some computers and other supplies into the old jail, as Meeks was the only trustee working at the time. Thompson, accompanied by Meeks, used the keys to open the steel mesh door to the old jail, and the two of them carried the old computer equipment into the old jail. Both Thompson and Meeks agree that at this point they understood they were going to locate the hidden drugs in the old jail. In the toilet paper boxes located in the drunk tank of the old jail, Meeks found a plastic bag with a pound of marijuana in it and another plastic bag with a large quantity of cocaine in it. Thompson put the marijuana into the pockets of his cargo shorts and smuggled it out to his car.

While Thompson was depositing the marijuana in his car, Meeks made up several baggies of cocaine for Chambers to find, while the rest of the cocaine was to go to Puckett and Newman. Meeks smuggled the remaining cocaine, stuffed into his pockets, back into the new jail.

At approximately midnight, Jailer Beau Moody ("Moody") called Thompson and said that a toilet in B Pod was overflowing, and needed to be attended to. Thompson retrieved Meeks, and Meeks went into Newman, Puckett, and Smith's cell, where at least one of the inmates attempted to resolve the reported plumbing problem. At the same time, Meeks removed cocaine hidden in his pocket, and discretely handed it to Puckett. It was later determined that Puckett apparently placed the cocaine, which was sealed in two latex glove fingers, in his rectum at some point after he received the cocaine from Meeks.

Five hours later, at approximately 5:00 a.m. on February 15, 2010, Newman discovered that Puckett was not breathing and his body was twitching, and immediately alerted jail staff, including Thompson, who was still on duty. Newman told Thompson that Puckett had "gotten ahold of too much cocaine." Thompson immediately checked Puckett's pulse, started CPR, and radioed the tower to call for an ambulance. Jail staff administered CPR until the paramedics arrived, and continued to assist the paramedics following their arrival. In addition, Thompson informed the paramedics of the possibility of a cocaine overdose when they arrived at the jail. Shortly thereafter, Puckett was transported to a local hospital. Puckett subsequently died from what the medical examiner determined to be acute toxic effects of cocaine. In particular, the medical examiner discovered two torn latex glove fingers containing cocaine in Puckett's rectum. Thompson was suspended without pay, terminated, then arrested on February 17, 2010.

## DISCUSSION

As a general rule, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

### A. State Law Claims Against the Board

The Board contends Plaintiff's state law tort claims must be dismissed pursuant to the Oklahoma Governmental Tort Claims Act ("OGTCA"), Okla. Stat. tit. 51, § 151, *et seq.* Section 155(24) of the OGTCA provides:

> The state or a political subdivision shall not be held liable if a loss or claim results from:
>
>> 24. Provision, equipping, operation or maintenance of any prison, jail or correctional facility, or injuries resulting from the parole or escape of a prisoner or injuries by a prisoner to any other prisoner; provided, however, this provision shall not apply to claims from individuals not in the custody of the Department of Corrections based on accidents involving motor vehicles owned or operated by the Department of Corrections.

In *Medina v. State*, the Oklahoma Supreme Court answered a certified question of law posed to it by the United States District Court for the Western District of Oklahoma, explaining:

> Reading the three clauses of § 155(23) together reveals an intent to withhold the waiver of sovereign immunity for any loss or injury, whether to an inmate or other person, resulting from the operational level acts required to furnish the services of a penal institution, including the construction and repair of the facility; the security of the facility; the employment of personnel; the utilities and furnishings of the facility; the food, clothing, items for hygiene and other basic personal items needed by inmates or other persons; the educational, rehabilitative, communicational, recreational and medical and health services or any other service provided for inmates or other persons; the assignment of an inmate to a facility or a cell; and the release of an inmate; with the single exception of loss to persons not in custody caused by an accident involving a motor vehicle operated by the Department of Corrections.

871 P.2d 1379, 1384 (Okla. 1993).

Here, Plaintiff alleges that Puckett died because of the negligent acts of the Mayes County Sheriff, the Mayes County Jail Administrator, and other jailers of Mayes County, as well as the negligent establishment of policies, procedures, and regulations by the Mayes County Sheriff's Office, which led to Puckett's death while in the Mayes County Jail. As such, Plaintiff's claims against the Board arise within the context of the operation of the Mayes County Jail, and the Board is immune from suit pursuant to Okla. Stat. tit. 51, § 155(24). Accordingly, the Board is entitled to summary judgment on all pendant state law tort claims.[2]

**B. 42 U.S.C. § 1983 Claims**

Plaintiff also asserts claims pursuant to 42 U.S.C. § 1983, which provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

---

[2] The Board is also immune from liability based on the actions of Jailer Thompson. Pursuant to Okla. Stat. tit. 51, § 153(A), "[t]he state or a political subdivision shall not be liable under the provisions of [the OGTCA] for any act or omission of an employee acting outside the scope of his employment." The OGTCA defines "scope of employment" as "performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority … " Okla. Stat. tit. 51, § 152(12). Here, the Court finds that Jailer Thompson's actions occurred outside the scope of his employment as a jailer for the Mayes County Jail. Accordingly, the Board may not be subject to liability for Jailer Thompson's actions.

Thus, in order to establish liability under § 1983, the Plaintiff must prove that: (1) a person; (2) subjected or caused one to be subjected to the deprivation of a federal statutory or constitutional right; (3) by someone acting "under the color of law." 42 U.S.C. § 1983. As such, it is essential for Plaintiff to prove a deprivation of a constitutional right.

**A. Eighth Amendment Claim**

Plaintiff argues that Puckett's Eighth Amendment right to be free from cruel and unusual punishment was violated by Sheriff Cantey. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment …." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). But "the Constitution does not mandate comfortable prisons," and conditions may be "restrictive and even harsh." *Rhodes v. Chapman,* 452 U.S. 337, 347, 349 (1981). Indeed, "only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). At a minimum, the Eighth Amendment requires prison officials to provide "adequate food, clothing, shelter and medical care," and "take reasonable measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832. Furthermore, the Court's analysis should not be based on "[its] idea of how best to operate a detention facility." *Id.* at 351. Rather, the analysis should reflect a "balance between judicial respect for the exigencies of running a prison and the 'broad and idealistic concepts of dignity, civilized standards, humanity and decency' embodied in the Eighth Amendment." *DeSpain,* 264 F.3d at 973 (quoting *Estelle,* 429 U.S. at 102) (internal citations omitted). Plaintiff asserts a violation of Puckett's Eighth Amendment rights based on the conditions under which Puckett was confined, arguing, essentially, that the presence of drugs in the evidence room of the old jail was a

condition of confinement posing a substantial risk of serious harm to inmates in the Mayes County Jail, and jail officials failed to prevent Puckett from being harmed by these conditions.

**1. Failure to Prevent Harm**

At the outset, the Court notes the unique circumstances of this case. The parties did not cite, nor could the Court locate, a case where an inmate has asserted an Eighth Amendment violation under similar circumstances. To be sure, this case does not neatly fit into the established paradigm of Eighth Amendment cases based on conditions of incarceration. Indeed, cases applying the "failure to prevent harm" standard have generally dealt with cases of either inmate-on-inmate or jailer-on-inmate assault. *See Farmer*, 511 U.S. at 832-33; *see also Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001). Other "failure to prevent harm" cases have dealt with health conditions within a correctional facility, reasoning that forcing inmates to live under inhumane conditions may violate those inmates Eighth Amendment rights. *E.g. Hutto v. Finney*, 437 U.S. 678, 686-87 (1978) (inmate confinement for long periods of time in isolation cells); *DeSpain*, 264 F.3d 965, 972 (10th Cir. 2001) (prison flooding leading to unsanitary conditions); *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989) (inmate incarcerated in a cell smeared with feces). Although these cases lack the important element of self-inflicted harm present in the instant case, the Court finds the "failure to prevent harm" standard should be applied to the instant case.[3]

In accordance with the Eighth Amendment principles outlined above, the United States Supreme Court announced a two-part conjunctive test to be utilized when analyzing failure to prevent harm claims. "In order to establish a failure to prevent harm claim under the Eighth

---

[3] The Court recognizes that jailers are not immune from liability simply because an inmate's harm is self-inflicted. *See Estate of Hocker by Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994) (recognizing that jail officials' deliberate indifference to the risk that an inmate will commit suicide constitutes an Eighth Amendment violation).

Amendment, Plaintiff must show (1) [Puckett] was 'incarcerated under conditions posing a substantial risk of serious harm,' and (2) defendants were deliberately indifferent to [Puckett's] safety." *DeSpain v. Uphoff*, 264 F.3d 965, 971-72 (10th Cir. 2001) (quoting *Farmer,* 511 U.S. at 834).

The first requirement, that the conditions complained of must be "sufficiently serious" to implicate constitutional rights, is an objective inquiry. To establish this element, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 972. In order to establish the second requirement, "the Supreme Court has explained that 'deliberate indifference entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835). Further, the Supreme Court "defined this 'deliberate indifference' standard as equal to 'recklessness,' in which 'a person disregards a risk of harm of which he is aware.'" *Id.* (quoting *Farmer*, 511 U.S. at 836-37).

### *a. Sufficiently Serious Conditions of Incarceration*

The Court finds that Plaintiff has failed to meet her burden with regard to the first requirement, that is, that Puckett was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 971-72. To be sure, Plaintiff has presented evidence sufficient to establish that the conditions of incarceration at the Mayes County Jail may have posed *some risk* of serious harm to Puckett. There is no doubt that the presence of drugs in an evidence storage room located in a building connected to a jail or correctional facility presents a certain amount of danger to inmates and jail officials alike. Access to the evidence storage room at issue in this case, however, was restricted by a number of mechanisms. First, the evidence storage room was located in the old jail, requiring a trustee to proceed through two steel doors to gain access to the

old jail. In addition, after gaining access to the old jail, a trustee would have to get through two locked doors, with two separate keys, to get into the old evidence room. Further, when trustees were working in the old jail, they were monitored by surveillance cameras mounted over the hallways in the old jail. Finally, the Mayes County Jail had a policy of frisking trustees returning from the old jail before the trustees were allowed to return to the jail. Thus, even if a trustee was able to gain access to the old evidence room and steal drugs, the trustee would still have to conceal the drugs in order to avoid detection during one of these frisks. These measures significantly reduced the risk of harm to inmates posed by the presence of drugs in the old evidence room.

It is also important to note the steps taken by jail officials after Puckett was discovered with drugs on February 5, 2010. After jailer's discovered Puckett under the influence of drugs, it is undisputed that Puckett was placed under lockdown in "Detox 2." In addition, jailers conducted an investigation of the incident, questioning Puckett in order to determine the source of the drugs. After Puckett admitted to using drugs, a search of the entire jail facility, including the old jail, was conducted in order to find and confiscate any drugs contraband present. Thus, in the unlikely event that an inmate was able to smuggle drugs into the Mayes County Jail, inmates would still have to keep the drugs concealed or risk having the original source of the drugs discovered and extinguished after jailers learned of the presence of drugs or drug use by inmates. These procedures further reduced any risk of harm posed to inmates by the drug evidence in the old jail.

The Sheriff is not subject to liability simply because Puckett was able to thwart the mechanisms in place to prevent inmates from accessing the drugs in the old evidence room. The Eighth Amendment does not require jail officials to eliminate all risks associated with

incarceration. Jail officials only have a duty to take reasonable steps to ensure inmate safety. In this case, the Court finds the proper steps were taken to reduce the risk posed by the drugs in the Old Evidence Room. In light of these steps, the Court simply cannot conclude that Puckett was incarcerated under conditions posing a significant risk of harm to inmates. Accordingly, Plaintiff cannot meet her burden to establish that Puckett suffered a constitutional deprivation.[4]

Because Plaintiff's complaint failed to establish that the conditions of confinement at the Mayes County Jail violated the Eighth Amendment, no liability can attach to Sheriff Cantey in his official capacity. "[L]iability will not attach where there was no underlying constitutional violation by any of the municipality's officers." *Ellis ex rel. Estate of Ellis v. Ogden City,* 589 F.3d 1099, 1104 (10th Cir. 2009) (brackets omitted) (quotation omitted). Accordingly, the Sheriff is entitled to summary judgment.

## CONCLUSION

For the reason's outlined above, the Sheriff's Motion for Summary Judgment and the Boards Motion for Summary Judgment are **GRANTED.**

_____
James H. Payne
United States District Judge
Northern District of Oklahoma

---

[4] The Court notes that even if Plaintiff could establish that Puckett was incarcerated under conditions posing a substantial risk of harm, Plaintiff would be unable to establish deliberate indifference to any such risk on the part of any Mayes County Jail official.